# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ALIXPARTNERS, LLP,<br>ALIXPARTNERS HOLDINGS LLP,<br>and ALIXPARTNERS S.R.L., | )<br>)<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | C.A. No. 2019-0392-KSJM |
| GIACOMO MORI, | )<br>) | |
| Defendant. | ) | |

## POST-TRIAL MEMORANDUM OPINION

Submitted: November 5, 2021
Dated: April 14, 2022

Bradley R. Aronstam, Eric D. Selden, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Nicholas J. Pappas, Robert S. Berezin, Justin M. DiGennaro, WEIL, GOTSHAL & MANGES LLP, New York, New York; *Counsel for Plaintiffs AlixPartners, LLP, AlixPartners Holdings, LLP, and AlixPartners S.r.l.*

Giacomo Mori, *Pro se.*

**McCORMICK, C.**

The plaintiffs terminated the defendant's employment in May 2019. In anticipation of his termination, the defendant copied thousands of the plaintiffs' confidential documents onto his personal devices. He did so to use them in a follow-on employment lawsuit in Italian court, although he also used certain of the documents for other, innocuous, personal ends—to update his curriculum vitae and email goodbyes to his former clients. The plaintiffs sued the defendant in this court for breach of a partnership agreement and various "award agreements" governing his equity compensation. The plaintiffs also brought claims for misappropriation of trade secrets and conversion.

The fact that the defendant executed a limited partnership agreement for a Delaware entity as a condition to receiving his equity compensation created a jurisdictional hook for the defendants to proceed in this court. In that way, this case is one of many employment disputes to enter the Court of Chancery under the guise of an internal governance dispute. For reasons unique to this case, the court denied the defendant's motion to dismiss and allowed the case to advance.

The parties stipulated early in this litigation to a status quo order under which the defendant agreed to much of the relief ultimately sought by the plaintiffs. The defendant returned the documents he copied, other than those that he needed for the Italian employment action, and submitted his personal devices for forensic examination.

The plaintiffs pressed on with their claims. This post-trial decision finds that the plaintiffs have proven that the defendant breached the partnership agreement and grants the plaintiffs' request for nominal damages in the amount of $7. This decision also stays aspects of the plaintiffs' claims subject to Italian law to permit the plaintiffs to submit

supplemental briefing at their election. Otherwise, judgment is entered in favor of the defendant.

## I. FACTUAL BACKGROUND

The court held a four-day trial by Zoom on June 1 through 3 and July 6, 2021.[1] The record comprises 207 trial exhibits, video testimony from four fact and four expert witnesses, depositions from three witnesses, and seventy-five stipulations of fact. These are the facts as the court finds them after trial.[2]

### A. The AlixPartners Entities

Plaintiffs AlixPartners, LLP ("AlixPartners") and AlixPartners Holdings, LLP ("Alix Holdings") are Delaware limited liability partnerships with principal places of business in New York, New York.[3] Plaintiff AlixPartners S.r.l. ("Alix Srl") is an Italian subsidiary of AlixPartners based in Milan, Italy.[4] For simplicity, this decision refers to Alix Srl, together with AlixPartners and Alix Holdings, as "AlixPartners" or "Plaintiffs."

---

[1] *See* C.A. No. 2019-0392-KSJM, Docket ("Dkt.") 190–94, 196.

[2] The Factual Background cites to: C.A. No. 2019-0392-KSJM docket entries (by docket "Dkt." number); trial exhibits (by "JX" number); the trial transcript (Dkt. 190–94, 196) ("Trial Tr."); and stipulated facts set forth in the Parties' Joint Pre-Trial Order (Dkt. 184) ("PTO"). The following witnesses testified at trial: Paolo Rinaldini (fact), John Racich (expert), John Beeskow (fact), Stefano Aversa (fact), and Giovanni Gaudio (expert) for Plaintiffs and Giacomo Mori, Luca Failla (expert), and Giuseppe Dezzani (expert) for Defendant. The parties relied on the deposition transcripts of the following witnesses: Giacomo Mori (Defendant), Giuseppe Dezzani (Defendant's forensic expert), and Luca Failla (Italian law expert). The deposition transcripts are cited by using the witnesses' last names and "Dep. Tr."

[3] PTO ¶¶ 23, 24.

[4] *Id.* ¶ 25.

AlixPartners is a business advisory firm that specializes in turnaround and restructuring.[5]  It provides a range of consulting services from enterprise improvement to information management.[6]  The turnaround business seeks to boost profits and reduce costs through "hands-on" and "pragmatic" services.[7]

## B.    Mori's Employment With Alix Srl

Defendant Giacomo Mori is an Italian citizen residing in Italy who was formerly employed by Alix Srl.[8]  Alix Srl hired Mori as a director of the Milan office of Alix Srl in September 2003 and promoted him to managing director of that office in January 2014.[9]

Over the course of his employment, Mori entered into various agreements with AlixPartners.  He executed his most recent employment agreement with Alix Srl in February 2014 in connection with his promotion to managing director (the "Employment Agreement").[10]

In 2014, Mori began receiving performance-based option awards from Alix Holdings on a near-yearly basis as part of his compensation package.[11]  Those options were governed by Option Award Agreements between Mori and Alix Holdings dated April 21,

---

[5] *Id.* ¶ 23.

[6] *Id.*

[7] Trial Tr. at 272:18–22, 273:6–8 (Aversa).

[8] PTO ¶ 26.

[9] *Id.* ¶¶ 48, 49.

[10] *See* JX-9 ("Empl. Agreement").

[11] Trial Tr. at 431:16–432:1 (Mori).

2014, April 18, 2016, February 14, 2017, April 19, 2017, and April 17, 2018 (the "Award Agreements").[12]

The Award Agreements required each participant to join an "Equityholders' Agreement."[13] They also required each participant to join the then-operative Alix Holdings partnership agreement.[14]

When executing each Award Agreement, Mori signed an omnibus joinder agreeing to these additional agreements. Most recently, on April 23, 2018, he signed an omnibus joinder to the Equityholders' Agreement and the Second Amended and Restated Limited Liability Partnership Agreement of AlixPartners Holdings, LLP, dated January 12, 2017 (the "Partnership Agreement").[15]

The Employment Agreement and the Partnership Agreement contain provisions restricting Mori's use of confidential information.[16]

The Partnership Agreement provides that "[e]ach Partner . . . agrees that such Partner shall keep confidential, and shall not disclose to any third Person or use for its own

---

[12] JX-11 (Apr. 2014); JX-18 (Apr. 2016); JX-28 (Feb. 2017); JX-33 (Apr. 2017); JX-37 (Apr. 2018).

[13] *See* JX-11 § 5 & Ex. A; JX-18 § 5 & Ex. A; JX-28 § 5 & Ex. A; JX-33 § 5 & Ex. A; JX-37 § 5 & Ex. A; JX-5 (Equityholders' Agreement).

[14] JX-33 at 1; *see also* Trial Tr. at 432:6–10, 433:15–434:7 (Mori).

[15] *See* PTO ¶ 28; JX-27 (P'ship Agreement); JX-37 Ex. A. The Partnership Agreement was amended on February 7, 2019, but that is irrelevant to the parties' dispute.

[16] *See* Empl. Agreement at 5–6; P'ship Agreement § 15.3.

4

benefit, without the consent of the Board, any non-public information with respect to the Partnership" excluding certain circumstances not presented here.[17]

The Employment Agreement provides that Mori

> agree[s] not to, at any time, either during or subsequent to the termination of [his] employment by the Company, disclose or use, directly or indirectly, for [his] own benefit or the benefit of any other entity, any confidential or proprietary information of the Group that [he] gain[s] by reason of [his] employment.[18]

The Employment Agreement further requires that "[u]pon termination of this Agreement for any reason whatsoever, [Mori] agree[s] to immediately deliver and return to the Company all memoranda, notes, records, agreements, documents and other materials relating in any way to Confidential and Proprietary Information."[19]

The Employment Agreement and Award Agreements contain provisions restricting Mori's ability to solicit AlixPartners' business, existing or prospective clients, or employees post-termination.

The Award Agreements each contain a two-year non-solicitation provision prohibiting "the solicitation of any business from, or attempt to influence, any of [AlixPartners'] clients, prospective clients or Lead Sources."[20]

The Employment Agreement contains a one-year non-solicitation provision barring the "solicitation of any business from, or attempt to influence," any of AlixPartners'

---

[17] P'ship Agreement § 15.3.

[18] Empl. Agreement at 5.

[19] *Id.* at 7.

[20] *See, e.g.*, JX-37 § 8(b).

"clients, active prospective clients, [or] Lead Sources" or solicit the employment of AlixPartners' "Managing Directors, employees or independent contractors."[21]

All of the agreements entered into by the parties, except the Employment Agreement, are subject to Delaware forum selection and Delaware choice of law provisions. The Partnership Agreement and Equityholders' Agreement each contain Delaware forum selection[22] and Delaware choice of law[23] provisions. The Equityholders' Agreement's Delaware forum selection and Delaware choice of law provisions apply to the 2014 and 2016 Award Agreements.[24] The Award Agreements executed during and after February 2017 are subject to the Partnership Agreement's Delaware forum selection provision,[25] and each contains its own Delaware choice of law provision.[26] The Employment Agreement does not contain a forum selection clause, but it contains an Italian choice of law provision.[27]

---

[21] Empl. Agreement at 4–5.

[22] P'ship Agreement § 15.9; Equityholders' Agreement § 5.8.

[23] P'ship Agreement § 15.8; Equityholders' Agreement § 5.7.

[24] *See* JX-11 § 15; JX-18 § 15.

[25] P'ship Agreement § 15.9.

[26] JX-28 § 15; JX-33 § 15; JX-37 § 15.

[27] Empl. Agreement at 8.

## C. AlixPartners' Protection Of Its Confidential And Proprietary Information

In addition to the various confidentiality provisions included in the parties' contractual arrangements, AlixPartners protected its confidential information during Mori's tenure through data loss prevention systems and policies.

AlixPartners uses the Symantec Data Loss Prevention system (the "DLP System") to detect unauthorized use of its confidential information.[28] The DLP System notifies AlixPartners security personnel whenever someone stores, accesses, or transfers files that meet certain keyword criteria within the organization.[29] If the system identifies the movement of files or folders containing certain keywords, it records such movements in a log, an AlixPartners IT employee reviews the log, and if necessary, escalates the issue to AlixPartners' legal department, human resources, or outside consultants, based on a host of factors.[30]

AlixPartners also uses the WinMagic SecureDoc platform (the "SecureDoc System"), which logs data copied to USB devices from AlixPartners' assets, captures information about this activity, and creates password protected encrypted containers on any private USB devices to which AlixPartners data is copied.[31] Similar to the DLP System, if the SecureDoc System identifies movement of files or folders from AlixPartners' systems

---

[28] PTO ¶ 42; Trial Tr. at 210:10–211:9 (Beeskow).

[29] PTO ¶¶ 42–44; Trial Tr. at 220:10–221:23 (Beeskow).

[30] PTO ¶ 44; Trial Tr. at 221:19–224:1 (Beeskow).

[31] PTO ¶ 45; Trial Tr. at 226:17–227:6 (Beeskow).

to external USB devices, it logs such movements, an AlixPartners IT employee reviews the log, and if necessary based on the context (including volume of data), the employee escalates the issue to AlixPartners' legal department, human resources, or outside experts, as appropriate.[32]

AlixPartners also maintains an "Acceptable Use Policy" to safeguard its confidential information.[33] The purpose of this policy is to establish the expectations, requirements, and responsibilities of anyone using AlixPartners' systems and devices.[34] On December 6, 2018, AlixPartners disseminated the latest version of the policy for the Milan office by email and posted the policy on the company's intranet.[35]

Section 3.2 of the Acceptable Use Policy provides that "Information Users must not use personal equipment (such as laptops or desktops) or personal USB sticks to access or store AlixPartners data."[36]

Section 3.10 provides that "[u]pon termination from AlixPartners: Information Users must cease using any AlixPartners provided equipment, software or subscriptions and shall not download or retain any AlixPartners data or information. Furthermore, terminated employees and contractors shall promptly return same to AlixPartners."[37]

---

[32] PTO ¶ 46; Trial Tr. at 227:21–229:19 (Beeskow).

[33] PTO ¶ 32; Trial Tr. at 208:16–20 (Beeskow); JX-7 (Acceptable Use Policy).

[34] Trial Tr. at 209:22–210:3 (Beeskow).

[35] PTO ¶¶ 34–37; Trial Tr. at 209:2–15, 210:4–9 (Beeskow), 17:4–18:1 (Rinaldini).

[36] Acceptable Use Policy § 3.2; PTO ¶¶ 34–35, 37.

[37] Acceptable Use Policy § 3.10; Trial Tr. at 18:11–22 (Rinaldini), 218:9–219:7 (Beeskow).

Section 3.11 provides that

> Upon termination from AlixPartners: Information Users must leave intact all Information Assets or data in their possession or control. Information Assets are to be returned to [AlixPartners]. Any act of willful destruction of assets or data, or the deliberate and unauthorized disclosure of information . . . will be referred to Risk Management and senior management for determination of further action by the firm.[38]

The Acceptable Use Policy contains a variety of other provisions designed to secure AlixPartners' confidential information, including provisions prohibiting employees from creating their own backups of AlixPartners' data, setting parameters on how and when certain types of AlixPartners data can be deleted, and prohibiting the use of personal removable media for the storage of AlixPartners data.[39]

As discussed below, however, aspects of the Acceptable Use Policy were not strictly enforced.

### D. AlixPartners Terminates Mori's Employment.

On April 2, 2019, AlixPartners notified Mori by letter that because of his engagement with a client, which the parties to this litigation refer to as "Client 1," he was in violation of various agreements and AlixPartners' policies (the "April 2 Letter").[40] Specifically, AlixPartners alleged that Mori violated the "Client Due Diligence

---

[38] Acceptable Use Policy § 3.11; Trial Tr. at 18:11–22 (Rinaldini), 219:8–220:9 (Beeskow).

[39] *See* Acceptable Use Policy; Trial Tr. at 234:14–19, 235:3–24 (Beeskow).

[40] PTO ¶ 55; JX-49 (April 2 Letter).

Requirements, Code of Conduct, Approval Procedure for Interim Officer Engagements, and the Travel, Entertainment, and Expense Reporting Policy."[41]

On April 12, 2019, Mori responded by letter, and on April 26, 2019, he met with: Steve Deedy, Head of the Partnership Matters Office; Paul Thompson, the Head of Operations for Europe, the Middle East, and Asia; and Paolo Rinaldini, the Head of AlixPartners' Milan Office.[42] The meeting included discussions about a mutually acceptable separation between Mori and AlixPartners.[43] Mori and Thompson met again on May 7, 2019 to continue the discussions.[44]

The discussions did not result in a mutually acceptable separation agreement. In a letter dated May 10, 2019, AlixPartners informed Mori that he was being terminated for cause on the grounds that Mori had violated the "Client Due Diligence Requirements, Code of Conduct, Approval Procedure for Interim Officer Engagements, and the Travel, Entertainment, and Expense Reporting Policy."[45]

### E.    Mori Begins Working For Client 2.

Eleven days after Mori received notice of his termination, Mori signed an employment agreement with an AlixPartners client referred to as "Client 2."[46]

---

[41] PTO ¶ 55.

[42] *Id.* ¶¶ 57–58.

[43] *Id.* ¶ 58.

[44] *Id.* ¶ 61.

[45] *Id.* ¶¶ 62–63.

[46] *Id.* ¶ 66.

AlixPartners was in the middle of negotiating an engagement with Client 2 at the time of Mori's departure. Before Mori's departure, AlixPartners had proposed to Client 2 that Mori to lead the AlixPartners team on the Client 2 project as a consultant.[47] After AlixPartners determined to terminate Mori's employment, AlixPartners proposed to Client 2 that a different Managing Director serve in that role.[48] Client 2 refused and hired Mori as Transformation Director at one-tenth of the costs being negotiated with AlixPartners.[49]

### F.    Prior To His Departure, Mori Copies AlixPartners Files.

While Mori was negotiating with AlixPartners concerning a possible separation agreement and before his termination, Mori downloaded information from his work computer to personal devices.

Over the ten days following his receipt of the April 2 Letter and in preparation for his April 12 response letter, Mori copied more than 100 files and folders from his work computer to a thumb drive, which the parties refer to as the "Kingston Thumb Drive."[50]

The day after he met with Rinaldini, Thompson, and Deedy, on April 27, 2019, Mori copied thousands of additional files to the Kingston Thumb Drive.[51]

---

[47] *Id.* at 281:21–283:3 (Aversa).

[48] PTO ¶ 61.

[49] *Id.* ¶¶ 61, 67–71; Trial Tr. at 478:8–24, 481:19–22, 482:11–17 (Mori).

[50] Trial Tr. at 117:17–118:21 (Racich).

[51] *Id.* at 118:22–119:24 (Racich).

When it became clear to Mori that the parties would not reach a mutually acceptable separation agreement, on May 9, 2019, he began copying additional documents from his work computer to a digital drive and a personal computer he had recently purchased.[52]

Between May 9 and May 13, 2019, Mori copied roughly 160,000 unique documents from his work computer to his personal digital drive.[53] Among these files were five PST files which are archives containing thousands of emails and contacts.[54] Mori ultimately copied some of the files from his digital drive to his personal computer,[55] and documents from his personal computer to a separate hard drive.[56]

Before his departure, Mori did not use unlawful means to access the documents he copied from his work computer.[57] He was permitted to access his work computer, even if AlixPartners' use policies ostensibly prohibited the downloading of certain information.[58]

Some of the documents that Mori copied were personal. When Mori joined AlixPartners in 2003, he was not prohibited from using his work computer for personal purposes.[59] Even though later-adopted use policies prohibited the storage of personal

---

[52] PTO ¶ 39.

[53] Trial Tr. at 140:8–142:9 (Racich); JX-124 ¶¶ 27–33; JX-129.

[54] Trial Tr. at 141:5–142:2 (Racich); JX-124 ¶ 30.

[55] Trial Tr. at 142:10–143:2 (Racich); JX-124 ¶¶ 26, 33; JX-129.

[56] Trial Tr. at 144:7–145:2 (Racich); JX-124 ¶¶ 42–47; JX-129.

[57] Trial Tr. at 410:17–22 (Mori).

[58] *Id.* at 235:17–24 (Beeskow); PTO ¶ 37 ("On December 6, 2018, AlixPartners updated its Acceptable Use Policy to Version 4.5. Version 4.5 of the Acceptable Use Policy contained the same prohibition on employees in the Milan office copying AlixPartners' data to their personal devices as contained in Versions 4.2 and 4.4.").

[59] PTO ¶ 33.

information on AlixPartners' devices, AlixPartners did not control the storage of personal data on their devices, and AlixPartners witnesses testified that it was common practice to store personal information on such devices.[60] Mori provided a number of examples of this practice.[61] Over his fifteen years of employment, Mori stored on his work computer tens of thousands of personal documents, such as pictures of family vacations and bank statements.[62]

Other documents that Mori copied belonged to AlixPartners.[63] They included AlixPartners presentations; AlixPartners reports, revenue assessments, pricing analyses, and studies; notes from AlixPartners meetings; documents regarding AlixPartners recruiting, employee retention, candidate evaluation, compensation, benefit structure, and performance review process; marketing and branding strategies and efforts; and .PST files containing emails and contacts.[64] Many of these documents contained search terms associated with clients Mori billed while at AlixPartners, including Client 2.[65]

---

[60] Trial Tr. at 92:4–16 (Rinaldini).

[61] *See, e.g.*, JX-171; Trial Tr. at 96:2–97:9 (Rinaldini).

[62] Trial Tr. at 411:4–6 (Mori) ("I copied such documents because they were in the most part personal documents. They were fifteen years of personal history."); *id.* at 589:13–16 (Dezzani) ("There are photos of his—of the trips that he took with his children. There are very personal things, such as bank statements. There's all kinds of things.").

[63] Trial Tr. at 411:6–8 (Mori).

[64] Trial Tr. at 24:2–26:3, 140:8–142:9 (Racich); JX-124 ¶¶ 30–32.

[65] *See* JX-129; JX-130.

Of the documents copied by Mori, about 50% were personal and 50% were AlixPartners documents.[66]

### G.     AlixPartners Demands That Mori Return Documents.

AlixPartners' DLP System and SecureDoc System alerted the IT department of Mori's May 9 through May 13 document downloads.  By a letter dated May 13, 2019, Thompson demanded that, by May 15, 2019, Mori "return, delete and/or destroy all Confidential and Proprietary Information" he had taken and also return his work-issued laptop, phone, and other items.[67]  Thompson only cited the Employment Agreement as the basis for this demand.[68]

### H.     Mori Returns His Devices But Retains Copies Of The Documents For Use In Employment Litigation In Italy.

Mori partially complied with Thompson's request.  On May 14, 2019, Mori visited AlixPartners' Milan Office and returned the requested property.[69]

---

[66] Trial Tr. at 442:14–22 (Mori) ("Q. And was it your—well, I heard something from your testimony yesterday, but let me just ask you.  Is it your understanding that, as of May 9, on your work computer, a majority of the documents were personal?  A. I think we made a calculation.  I think it was in the range of 50/50.  Probably a little bit more the nonpersonal, but in that—in that range.").  Racich's analysis did not specifically identify what was personal versus what documents were associated with AlixPartners; rather, he used a series of keywords with client names to make conservative estimates of how many work documents Mori had downloaded.  *See id.* at 172:10–19 (Racich) ("I wasn't looking to identify personal, so I've never done that sort of analysis.  To be frank, it would be very difficult without some sort of work with someone who understood what would be personal to you, to be able to identify those personal.  So I am sure there are potentially personal files within that, within that 260,000 that didn't fall out of there.  But I don't know what that number would be.").

[67] JX-74 at 1.

[68] *See id.*; Empl. Agreement.

[69] PTO ¶ 65; JX-77 (May 14, 2019 checklist of returned items).

14

Although Mori returned the requested property, he retained copies of certain AlixPartners documents, and refused to certify their destruction. Under Italian law, where discovery is not a feature of ordinary course litigation,[70] employees have the right to retain documents upon their termination for the purpose of a follow-on lawsuit.[71]

Mori testified that this was his purpose in copying AlixPartners documents.[72] He further testified that he was overbroad in his data-harvesting efforts because he did not know, at the time of his termination, what would be relevant to his legal theories in litigation challenging his termination.[73] Mori's trial testimony was consistent with

---

[70] *See* Simona Grossi, *A Comparative Analysis Between Italian Civil Proceedings and American Civil Proceedings Before Federal Courts*, 20 IND. INT'L & COMPAR. L. REV. 213, 228 (2010); Trial Tr. at 350:24–351:6 (Gaudio) ("No, there is not such a pretrial discovery phase under Italian civil law procedure, but the parties have to produce their documents together when they file their claim. So the employee will have to file the documents with his initial claim, and the employer has to file his documents with his defense claim.").

[71] Trial Tr. at 335:5–11 (Gaudio) ("Then there was the possibility to justify this behavior according to the right of defense under Article 24 of the Italian Constitution, but the possibility to use the Article 24 defense is not at all absolute. There are certain limits to the possibility of recording to Article 24 to justify a violation of the duty of loyalty."); *id.* at 532:19–24 (Failla) ("Article 24 comes into play, so the right to one's defense comes into play, when the employee—and this happens very frequently—copies a company's documents of the employer and then produces these documents during proceedings with the labor law judge, in front of a labor law judge.").

[72] *Id.* at 411:6–8 (Mori); *see also* PTO ¶ 3; Dkt. 205 ("Def.'s Answering Post-Trial Br.") at 19, 25.

[73] Trial Tr. at 411:9–13 (Mori) ("In terms of the high number of documents, it is very well known that in order to be able to select the documents that are useful to prove a certain thesis, one needs to collect hundreds or maybe thousands of different documents."); *id.* at 559:7–11 (Failla) ("Any attorney with experience would have told Mr. Mori, create a copy of any and all documents, and then we'll figure out the ones we need. And the ones that are not needed, we will destroy them.").

contemporaneous communications. In a May 19, 2019 call between Mori and Aversa, for example, Mori candidly admitted to taking the files and stated simply that he needed the documents to defend himself in Italy.[74]

Mori also used certain AlixPartners documents for other purposes. He used six of the documents he copied from his work computer to update his CV around May 26, 2019.[75] He stated that he had been asked to do so by his employment attorney and was also contacted by headhunters.[76] Additionally, Mori used a list of emails he obtained from his work computer to email his contacts letting them know that he was moving on from AlixPartners.[77] He was forthright in admitting to all of this.[78]

## I.     AlixPartners Files This Litigation.

AlixPartners filed this suit on May 28, 2019, asserting six claims against Mori.[79]

In Count I, Plaintiffs claim that Mori breached the Employment Agreement.

In Count II, Plaintiffs claim that Mori breached the Partnership Agreement.

In Count III, Plaintiffs claim that Mori misappropriated AlixPartners' trade secrets.

---

[74] *Id.* at 294:18–295:7 (Aversa); *see also id.* at 413:24–414:3 (Mori) ("[A]s [Aversa and I] discussed, I conveyed to him that I needed the documents in order to defend myself in Italy, and I would not disclose them to any third parties.").

[75] *Id.* at 414:4–8 (Mori).

[76] *Id.* at 414:9–12 (Mori).

[77] *Id.* at 452:12–16 (Mori); Def.'s Answering Post-Trial Br. at 84; Trial Tr. at 414:16–18 (Mori).

[78] Trial Tr. at 414:4–18 (Mori).

[79] *See* Dkt. 1 (Compl.).

In Count IV, Plaintiffs claim that Mori converted AlixPartners' confidential and proprietary information.

In Count V, Plaintiffs seek a declaration that certain disputed agreements are enforceable and governed by Delaware law.

In Count VI, Plaintiffs seek a declaration that the Employment Agreement and Award Agreements are enforceable and that they temporarily prohibit the solicitation of clients and prospective clients.

### J. Mori Agrees To Submit His Devices To Forensic Imaging And To Return Any Documents He Did Not Intend To Use In The Italian Litigation.

With the Complaint, AlixPartners moved for a temporary restraining order to enjoin Mori from disclosing and to compel him to return AlixPartners' confidential and proprietary information.[80]

To moot the motion for a temporary restraining order, Mori agreed to a Status Quo Order, which the Court entered on June 5, 2019.[81] The Status Quo Order required Mori to:

> (i) not to disclose and/or use Plaintiffs' trade secrets and other confidential and proprietary information;
>
> (ii) to send the [Kingston Thumb Drive] to the offices of his Delaware counsel;
>
> (iii) to identify any copies of documents that he made from the [Kingston Thumb Drive]; and

---

[80] *See* Dkt. 1 (Mot. for TRO).

[81] *See* Dkt. 8 (First Status Quo Order) at 1–2; PTO ¶ 7.

17

(iv) to identify any documents or files containing confidential or proprietary information belonging to Plaintiffs in his possession that were not on the [Kingston Thumb Drive].[82]

On August 26, 2019, the parties entered a second Status Quo Order ("Second Status Quo Order"). Under the Second Status Quo Order, Plaintiffs allowed Mori to retain up to 300 AlixPartners documents that he believed to be relevant to his wrongful termination claim.[83] In exchange, Mori agreed to have his personal devices forensically imaged.[84] Once the forensic imaging process was completed, Mori agreed to delete AlixPartners documents apart from those on which he intended to rely and to submit his devices for a second forensic image confirming the deletion.[85]

The Second Status Quo Order further provided that "[i]f Defendant discovers any [AlixPartners documents] that remain on his personal computer, he shall not access, review, alter, or copy such documents."[86] The Second Status Quo Order gave AlixPartners the ability to demand a third forensic imaging.[87]

Mori complied with the terms of both Status Quo Orders.[88]

---

[82] Dkt. 24 ("Second SQO") at 2; PTO ¶ 8.

[83] Second SQO ¶ 16.

[84] *Id.* ¶ 2.

[85] *Id.* ¶¶ 6, 12.

[86] *Id.* ¶ 7.

[87] *Id.* ¶ 14.

[88] Trial Tr. at 415:7–20 (Mori).

18

**K.     The Court Declines To Dismiss Or Stay This Action In Favor Of Then-Unfiled Litigation In Italy.**

In June 2019, Mori moved to dismiss the Complaint for lack of subject matter jurisdiction, lack of standing, lack of personal jurisdiction, and failure to state a claim.[89]

In November 2019, the court issued a Memorandum Opinion denying the motion to dismiss but granting a stay as to the portions of the Complaint brought under the Employment Agreement.[90]

Mori's lead argument for dismissal was that two foreign laws divest the court of subject matter jurisdiction: a European Union ("EU") regulation enforceable as law in all EU member states including Italy, and a provision of the Italian Civil and Labour Procedure Code. The upshot of Mori's interpretation of both laws was that disputes over Mori's employment by AlixPartners belonged in an Italian court.[91] For reasons set out more fully in the Memorandum Opinion, the court denied the motion to dismiss, but concluded that Count I for breach of the Employment Agreement and the portion of Count VI claiming breach of the non-solicitation provision of the Employment Agreement should be stayed for practical reasons.

A number of considerations informed the court's reticence to issue a stay that was broader in scope. Two warrant mention. The first consideration was the fact that,

---

[89] *See* Dkt. 9.

[90] *See AlixPartners, LLP v. Mori*, 2019 WL 6327325, at *17 (Del. Ch. Nov. 26, 2019).

[91] The former requires that proceedings relating to an individual employment contract be brought in the Member State in which the employee is domiciled. The latter requires that disputes involving an Italian citizen's employment belong solely in the jurisdiction of the Italian Labour Judge. *See id.* at *6.

nominally, the claims under the Partnership Agreement addressed the relationship between an entity and one of its partners, Mori.[92] The second consideration was that no Italian litigation had been filed at the time that the Memorandum Opinion was issued.[93] The second consideration amplified the first because the lack of competing litigation made the court more willing to conclude that Delaware had an interest in resolving the dispute.

After the court issued the Memorandum Opinion, litigation on Plaintiffs' claims other than those asserted under the Employment Agreement moved forward. Count I and

---

[92] *See id.* at *9; *see also* Dkt. 47, Jan. 7, 2020 Oral Arg. Tr. at 8:20–22. The Memorandum Opinion did not look past the nature of the claims at issue to evaluate the fundamental nature of the relationship. But some might argue that Delaware law permits that approach. *See generally Focus Fin. P'rs, LLC v. Holsopple*, 241 A.3d 784, 802 n.4 (Del. Ch. 2020). And the court continues to grapple with Delaware's interest in resolving actions that are fundamentally employment disputes where Delaware entities are used as vehicles for employment compensation. *See, e.g.*, *id.* at 975 ("This case is fundamentally an employment dispute between Focus Sub and Holsopple. During his employment, Holsopple lived in California and performed a majority of his work there. Focus Sub and Holsopple should litigate this case in California under California law. Instead, in an effort to avoid California law and evade the California courts, Focus Sub included various employment-related provisions in its standard-form Unit Agreements, attempted to insulate those provisions from challenge using the Delaware-Law Provisions, and sought to shift any disputes to Delaware through the Delaware-Forum Provisions. Focus Sub then conditioned Holsopple's receipt of substantial portions of his compensation on his signing the standard-form agreements."). As discussed above, the Memorandum Opinion was based in part on the fact that an Italian action had not yet been commenced at the time the decision was issued. As discussed below, neither the filing of the Italian Action nor the Italian court's resolution of Mori's employment claims require revisiting the prior ruling under the law-of-the-case doctrine.

[93] *See AlixPartners*, 2019 WL 6327325, at *13; *see also* Dkt. 155, Mar. 4, 2021 Oral Arg. Tr. at 21:24–22:18.

20

the portion of Count VI brought under the Employment Agreement remain stayed, and the court granted a stay of Count V on January 7, 2020.[94]

Plaintiffs were granted leave to amend their complaint in March 2020 to add details supporting the AlixPartners board's finding that Mori was a "Bad Leaver" and a "Non-Qualified Leaver" as those terms are defined under the relevant agreements.[95]

Mori's counsel moved to withdraw from its representation of Defendant on July 21, 2020.[96] The court granted the motion to withdraw on September 22, 2020.[97] Thereafter, Mori represented himself in this litigation.

---

[94] Given the anticipated overlap between these proceedings and the anticipated Italian litigation, the court invited the parties to confer concerning an efficient path forward. *See AlixPartners*, 2019 WL 6327325, at *17. The parties were unable to reach an agreement, necessitating the court's involvement. In a bench ruling on January 7, 2020, the court clarified the scope of the stay. *See* Dkt. 47, Jan. 7, 2020 Oral Arg. Tr. at 8:12–16 ("To summarize, I am denying a stay of Counts II, III, IV, and the sustained portion of Count VI. I am ordering defendant to answer those counts. I am also allowing discovery to proceed as to those counts. And I am granting a stay of Count V.").

[95] *See* Dkt. 53 (Am. Compl.) ¶¶ 52–54, 61–65; Equityholders' Agreement; JX-25, 2017 LLP Interest and Option Plan ("2017 Plan"). These terms were also relevant to the AlixPartners Equity Exchange. The Equityholders' Agreement defines the term "Bad Leaver" as anyone "who is not a Good Leaver." Equityholders' Agreement, § 1.1(a). The Option Plan incorporates the definition of "Non-Qualified Leaver" in the AlixPartners Equity Exchange (the "APEX"). 2017 Plan § 2(y); *see also* JX-39 (APEX). The APEX defines a Non-Qualified Leaver as any Managing Director "who is not a Fully Qualified Leaver or a Partially-Qualified Leaver" or ceases to be one, including "any [Managing Director] that has Engaged in Competition." APEX § 2(w).

[96] Dkt. 81.

[97] Dkt. 98.

## L. The Italian Action

Meanwhile, on December 31, 2019, Mori filed suit against Alix Srl in the Labour Court of Milan, Italy, for his allegedly unlawful termination for cause (the "Italian Action").[98]

On August 2, 2021, the Italian court issued its opinion resolving that dispute.[99]

The Italian court found in Mori's favor on multiple issues and ordered Alix Srl to pay Mori over €1.7 million in severance and indemnification. Specifically, the Italian court declared invalid the termination letter of May 10, 2019, as well as the non-solicitation clauses contained in the hiring letter dated August 4, 2003, and the Employment Agreement.

Yet, the Italian court declined to reach several disputes between the parties. The Italian court found it lacked jurisdiction to adjudicate claims under the Award Agreements, which were contracts between Mori and Delaware entities and governed by Delaware law.[100] The court further declined to rule on Mori's request for a declaration that he was entitled to copy and retain AlixPartners' documents for use in the Italian Action on the grounds that Mori failed to identify specific documents or plead relevance.[101]

---

[98] PTO ¶ 12.

[99] Dkt. 204, Ex. A ("Italian Judgment").

[100] *See id.* at 55, 70.

[101] *See id.* at 10 ("In the case in question, the claim submitted to the judge for examination relates to documents not submitted in court, for which the appellant does not indicate any identifying element, nor does he provide a specific list. He does not even specify how these documents should be considered relevant to the proceedings and instrumental to exercise a right of defense. Ultimately, the claim of ascertainment appears extremely

## II. LEGAL ANALYSIS

This decision addresses Plaintiffs' breach of contract claims in Count II and some of Count VI and tort claims in Counts III and IV. Plaintiffs bear the burden of proving each element of these claims by a preponderance of the evidence.[102] "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not."[103]

Before addressing whether Plaintiffs have met their burden, this decision first resolves threshold questions raised (actually, raised again) by Mori concerning the court's exercise of personal and subject matter jurisdiction. Because Plaintiffs have proven a breach of the Partnership Agreement, this decision last addresses the issue of remedies.

### A. Personal and Subject Matter Jurisdiction

Repackaging points that he made on the motion to dismiss, Mori argues that the court lacks personal jurisdiction over him and subject matter jurisdiction over Plaintiffs' claims.

---

generic, from undetermined confines, whose object cannot be identified or evaluated. This claim is therefore qualified in terms of invalidity due to the indeterminacy of the object.").

[102] *See Simon-Mills II, LLC v. Kan Am USA XVI Ltd. P'ship*, 2017 WL 1191061, at *36 (Del. Ch. Mar. 30, 2017) (stating that a plaintiff "bears the burden of proving every element of its breach of contract claim, including damages, by a preponderance of the evidence"); *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *21, *24 (Del. Ch. May 18, 2009) (stating that a plaintiff bears the burden of proving misappropriation of trade secrets and conversion by a preponderance of the evidence).

[103] *Agilent Techs., Inc v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (citation and internal quotation marks omitted).

The court rejected both of these arguments at the pleading stage in the Memorandum Opinion.[104] Mori asks this court to revisit its prior decision.[105] In essence, Mori argues that his relationship with AlixPartners was fundamentally an employment relationship, that the Italian court's resolution of the Italian Action confirms this fact, and that this court should revisit its earlier decision in view of those developments.[106] Mori argues that since the Employment Agreement contains provisions similar to those at issue in Counts II, III, IV, and VI, then the Plaintiffs should have filed suit solely under the Employment Agreement in Italy.[107]

With the benefit of hindsight, the court can see now that Mori's relationship with AlixPartners was primarily an employment relationship; thus, reasonable minds can dispute the wisdom of the prior Memorandum Opinion rejecting Mori's arguments, including whether this court has an interest in adjudicating such claims.[108]

That said, the court declines to revisit its earlier decision under the law-of-the-case doctrine. "The law of the case doctrine is a self-imposed restriction that prohibits courts from revisiting issues previously decided, with the intent to promote 'efficiency, finality, stability and respect for the judicial system.'"[109] "The 'law of the case' is established when

---

[104] *See AlixPartners*, 2019 WL 6327325, at *8, *10–12.

[105] Def.'s Answering Post-Trial Br. at 6, 51–67.

[106] *Id.* at 52.

[107] *Id.* at 61.

[108] *See supra* note 92.

[109] *State v. Wright*, 131 A.3d 310, 321 (Del. 2016) (quoting *Cede & Co. v. Technicolor, Inc.*, 884 A.2d 26, 39 (Del. 2005)).

a specific legal principle is applied to an issue presented by facts which remain constant throughout the subsequent course of the same litigation."[110] The court will revisit decisions under the law-of-the-case doctrine "[o]nly where the moving party can show that justice compels departure from the doctrine due to clear error, injustice, or a change in circumstances."[111]

Mori has failed to clear the standard necessary to overcome the law-of-the-case doctrine. Here, the facts have remained largely the same. Indeed, the facts have strengthened somewhat for Plaintiffs because the Italian court found that it lacked jurisdiction over claims brought under the Award Agreements.[112] Declining jurisdiction over those claims at this point would leave the parties without a forum for resolving their dispute. Moreover, the Italian court's reasoning for declining jurisdiction under the Award Agreements applies with equal force to claims brought under the Partnership Agreement. Although reasonable minds can dispute the wisdom of the Memorandum Opinion, it was not clearly erroneous. Having required the parties to proceed to trial on this matter, fairness, efficiency, and finality require the court to issue a post-trial decision. As such, the court will not revisit its earlier rulings.[113]

---

[110] *Hoskins v. State*, 102 A.3d 724, 729 (Del. 2014) (citation omitted).

[111] *Sciabacucchi v. Malone*, 2021 WL 3662394, at *1 (Del. Ch. Aug. 18, 2021).

[112] *See* Italian Judgment at 70.

[113] *See Wright*, 131 A.3d at 321; *see also Malone*, 2021 WL 3662394, at *2 (denying, under the law-of-the-case doctrine, plaintiffs' motion for leave to amend as to claims that were previously dismissed).

## B.     Breach of Contract

Two of Plaintiffs' claims for breach of contract were brought to trial: Count II for breach of confidentiality obligations under the Partnership Agreement and Count VI for breach of non-solicitation obligations under the Award Agreements.

The Partnership Agreement and the Award Agreements contain choice of law provisions selecting Delaware law.[114] In accordance with these provisions, Plaintiffs argue that Delaware law governs the claims for breach of contract. Mori invokes Italian law to argue that the confidentiality provisions of the Partnership Agreement should not be enforced, but he does not dispute that Delaware law governs the claims for breach of contract generally.[115]

"Under Delaware law, the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiffs."[116]

---

[114] *See* P'ship Agreement § 15.8; JX-11 § 15; JX-18 § 15; JX-28 § 15; JX-29 § 15; JX-33 § 15; JX-37 § 15.

[115] *See, e.g.*, Def.'s Answering Post-Trial Br. at 58–64. As discussed below, Mori argues that the Partnership Agreement does not govern his employment relationship with Alix Srl. and that he had a right under Italian employment law to copy and retain the confidential information at issue in Count II. Phrased slightly differently, Mori contends that Italian law supplies a policy basis for declining to enforce the confidentiality provisions of the Partnership Agreement in these circumstances. The parties frame Mori's Italian law argument as a choice-of-law issue in portions of their briefing. *See, e.g.*, Dkt. 203 ("Pls.' Opening Post-Trial Br.") at 29–31; Def.'s Answering Post-Trial Br. at 60. But Section 178 of the Restatement (Second) of Contracts provides another framework for analyzing Mori's Italian law argument. *See* Dkt. 207 ("Pls.' Reply Post-Trial Br.") at 6–8.

[116] *WaveDivision Hldgs., LLC v. Millennium Digit. Media Sys., L.L.C.*, 2010 WL 3706624, at *13 (Del. Ch. Sept. 17, 2010).

"Delaware courts apply rules of contract interpretation to limited partnership agreements."[117] "When interpreting a contract, the role of a court is to effectuate the parties' intent."[118] "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent."[119] Absent ambiguity, "Delaware courts interpret contract terms according to their plain, ordinary meaning."[120] The "contract's construction should be that which would be understood by an objective, reasonable third party."[121]

### 1. Breach Of Confidentiality Obligations

In Count II, Plaintiffs claim that Mori breached the Partnership Agreement provision that prohibits Mori from using confidential information "for [his] own benefit, without the consent of the Board."[122]

Mori admits that he copied documents from his work computer to his personal computer and hard drives.[123] Although he denies that the information in these documents

---

[117] *Cantera v. Marriott Senior Living Servs., Inc.*, 1999 WL 118823, at *3 (Del. Ch. Feb. 18, 1999) (citation omitted).

[118] *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).

[119] *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (italics in original) (citation omitted).

[120] *Alta Berkeley VI C.V. v. Omneon, Inc.*, 41 A.3d 381, 385 (Del. 2012).

[121] *Salamone v. Gorman*, 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks omitted).

[122] P'ship Agreement § 15.3.

[123] Trial Tr. at 415:18–22 (Mori); *see* PTO ¶¶ 72–82.

constituted trade secrets, he does not dispute that the information was confidential.[124]  On the issue of liability, Mori's sole argument is that he was entitled to copy and retain the information under Italian law.[125]

Article 24 of the Italian Constitution provides for a right of defense in civil and administrative proceedings.[126]  This right appears crucial, as under Italian law, pretrial discovery is not a regular feature of civil litigation, and Italian judges will reject claims for lack of evidence if supporting documentation is not submitted concurrently with the filing of a claim.  In view of these aspects of Italian litigation, Italian courts have interpreted the constitutional right of defense to mean that an employee has the right, under certain circumstances, to take documents of an employer that the employee needs to use in a disciplinary proceeding or in the prosecution of a wrongful termination claim.[127]

---

[124] *See* Def.'s Answering Post-Trial Br. at 8–9 ("Trial also demonstrated that he copied work related files as well and he did so in full transparency (he knew that copying such a high number of documents would have made him detected by the company security systems), for the sole purpose of being able to defend himself in his unlawful dismissal case."), 79 ("The Trial also showed that Defendant stated from the very beginning (in the telephone call with Mr. Aversa in May 19, 2019) that he copied the documents for the sole purpose of being able to initiate the lawsuit in Italy [citation omitted] against his employer to oppose his termination which he believed to be unlawful; the facts demonstrate that he was right to challenge the termination that was, in fact, judged to be unlawful."), 89 ("In any case Plaintiffs failed to demonstrate that copied documents constituted trade secrets and that the defendant used or disclosed the copied information."), 90 ("Plaintiffs alleged that Defendant violated the confidentiality provision using copied files for his own benefit but they couldn't demonstrate any use apart from the use to enforce Defendant's rights in the Italian case and to update the CV, which were peacefully admitted by defendant himself since the beginning.").

[125] Trial Tr. at 420:18–421:3 (Mori).

[126] *See* JX-175 at 44 (art. 24 COSTITUZIONE [COST.] (It.)).

[127] *See* JX-122 ¶¶ 17–22; art. 24 COST. ("1. Everyone can take judicial action to protect individual rights and legitimate interests.  2. The right to defen[s]e is inviolable at every

28

Plaintiffs contend that addressing Mori's right-of-defense argument would be the equivalent of invalidating the Delaware choice-of-law provision. They further argue that there is no basis for rejecting Delaware law in favor of Italian law under Section 187 of the Restatement (Second) of Conflict of Laws.

Section 187 of the Restatement (Second) of Conflict of Laws provides that "[t]he law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be

---

stage and instance of the proceedings."); Trial Tr. at 535:8–536:1 (Failla) ("And the fundamental principle in labor law, or in labor proceedings, is that everything must be put in front of the judge, on the judge's table, from minute zero. And, obviously, the company needs to do the same thing, when the company needs to defend itself, by submitting briefs, listing all of the components of their defense. The fundamental principle is the burden of proof. And the employee who brings a claim needs to prove all of the facts that are at the basis of their claim, the foundations of their claim. If they don't do that, the judge will reject the claim based on a lack of evidence."); *id.* at 350:17–351:22 (Gaudio) ("Q. Now, Mr. Failla stated in paragraph 25 of his expert report that Mr. Mori had no other option than copying them all in order to exercise his right of defense in a potential wrongful termination claim. Is there pretrial discovery in Italy like there is in the United States, where the parties exchange certain documents before trial? A. No, there is not such a pretrial discovery phase under Italian civil law procedure, but the parties have to produce their documents together when they file their claim. So the employee will have to file the documents with his initial claim, and the employer has to file his documents with his defense claim.").

29

the state of the applicable law in the absence of an effective choice of law by the parties.[128]

In my view, however, Mori's argument begs the question of whether Italian law supplies a policy basis for declining to enforce the confidentiality provisions of the Partnership Agreement.  In this way, Mori's argument is better framed by Section 178 of the Restatement (Second) of Contracts.

Section 178(1) of the Restatement (Second) of Contracts provides that "[a] promise or other term of an agreement is unenforceable on grounds of public policy if legislation provides that it is unenforceable or the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of such terms."

When "weighing the interest in the enforcement of a term," Section 178(2) of the Restatement (Second) of Contracts provides three factors to consider: "(a) the parties' justified expectations, (b) any forfeiture that would result if enforcement were denied, and (c) any special public interest in the enforcement of the particular term."

Section 178(3) identifies four additional factors to consider "[i]n weighing a public policy against enforcement of a term":

> (a) the strength of that policy as manifested by legislation or judicial decisions,
>
> (b) the likelihood that a refusal to enforce the term will further that policy,
>
> (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and

---

[128] Restatement (Second) of Conflict of Laws § 187 (Am. L. Inst. 1971).

30

(d) the directness of the connection between that misconduct and the term.[129]

Under either framework, the question centers in part on the "fundamental" nature or the "strength" of the public policy at issue.[130] This decision makes the following assumption favorable to Mori—that Italian law provides a strong public policy for permitting Mori to take AlixPartners documents for use in the Italian Action under either Section 187 of the Restatement (Second) of Conflict of Laws or Section 178 of the Restatement (Second) of Contracts.

---

[129] Restatement (Second) of Contracts § 178 (Am. L. Inst. 1981). There is some support for the position that, when applying the principles of Section 178, courts are not limited to the public policy of the forum or the governing law. *See, e.g.*, *Wong v. Tenneco, Inc.*, 702 P.2d 570, 574–76 (Cal. 1985) (applying Mexican prohibition against foreign ownership and control of Mexican land to not enforce a California contact that violated Mexico's public policy); *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 143 (2d Cir. 2021) (finding "Chinese law required the defendants to engage in price-fixing" and dismissing a U.S. antitrust action under principles of comity because of the conflict between Chinese and U.S. law). I should flag that this legal principle has not been fully vetted, as the parties did not brief the applicability of Section 178. Ordinarily, this court would request supplemental briefing in this circumstance. Here, because the issue is not outcome-determinative, requesting supplemental briefing would have been a waste of the parties' time.

[130] *See generally* 8 *Williston on Contracts* § 19:8 (4th ed. Nov. 2021 Update) ("The result, that a court will not enforce a contract made with the intention of violating another jurisdiction's laws, may be reached either on the ground that *the agreement is directly opposed to the law of the place of the contract* or under the well-recognized conflict of laws principle that the law of the place of performance should be applied. Under either principle, except in very special circumstances, the law of a foreign place of performance will be a determining factor in making the agreement unenforceable." (emphasis added and footnote omitted)).

Assuming that Mori may wield his right of defense under Italian law in this way, it is an incomplete defense to Plaintiffs' claim for breach of the confidentiality provisions for two reasons.

First, the Italian court has already considered and rejected Mori's argument under Italian law for lack of proof. The court's conclusion is based on the following excerpt from the Italian Judgment, which was issued after trial:

> In the case in question, the claim submitted to the judge for examination relates to documents not submitted in court, for which the appellant does not indicate any identifying element, nor does he provide a specific list. He does not even specify how these documents should be considered relevant to the proceedings and instrumental to exercise a right of defense. Ultimately, the claim of ascertainment appears extremely generic, from undetermined confines, whose object cannot be identified or evaluated. This claim is therefore qualified in terms of invalidity due to the indeterminacy of the object.[131]

It is unclear what preclusive effect this aspect of the Italian Judgment has in this litigation; the parties did not brief the issue. At a minimum, the lack of weight accorded this defense by the Italian court has persuasive force in these proceedings.

Second, Mori admits that he used some of the documents he copied and retained for personal purposes and not to support his Italian employment claims. Specifically, Mori used the confidential information to create a contact list which he used "to send [his contacts] an email letting them know that [he] was moving on from AlixPartners, and . . .

---

[131] Italian Judgment at 10.

undertaking new adventures."[132]  Mori does not contend that this information was helpful

to his lawsuit.  Mori admits that his purpose was to communicate with former clients.

Thus, even if the court were to find that Mori did not violate the confidentiality

provision of the Partnership Agreement as to documents retained in support of the Italian

Action, Mori admitted that he copied and retained more than just those documents.  On

that admission, the court finds that Mori breached the Partnership Agreement.

### 2.    Breach Of Non-Solicitation Obligations

In Count VI, Plaintiffs claim that Mori breached the non-solicitation provision of

the Awards Agreements by convincing Client 2 to hire him.[133]

Section 8(b) of the Award Agreements (the "Non-Solicitation Provisions") provides

that:

> Participant agrees, while any portion of this Option or any
> [redacted] issued upon exercise of all or a portion of the Option
> are outstanding and for a period of two (2) years thereafter (the
> "Non-Solicitation Period"), not to directly or indirectly engage
> in the solicitation of any business from, or attempt to influence,
> any of the Group's clients, prospective clients or Lead Sources,
> nor to conduct or participate (directly or indirectly, including
> through one or more affiliates) in hiring, attempting to hire or
> assisting any other person in hiring or attempting to hire, or
> inducing to leave the employ of the Group, any employee or
> officer of the Group, any person who was an employee or
> officer of the Group during the Non-Solicitation Period, or any
> contractor of the Group who performed services for the
> Company during the Non-Solicitation Period.[134]

---

[132] Trial Tr. at 452:12–16 (Mori); JX-84.

[133] Pls.' Opening Post-Trial Br. at 43–44.

[134] JX-11 § 8(b); *see also* JX-18 § 8(b); JX-28 § 8(b); JX-33 § 8(b); JX-37 § 8(b).

Plaintiffs argue that Mori at least "attempt[ed] to influence" Client 2 during the Non-Solicitation Period in violation of the Non-Solicitation Provisions.[135] Plaintiffs have proven that, before Mori was terminated, he was selected to lead a consulting team to support Client 2.[136] When Plaintiffs decided to terminate Mori, Plaintiffs "proposed to Client 2 a consulting team led by a different Managing Director of the Milan Office and that Client 2 refused such proposal."[137] Eleven days after his termination, Mori accepted employment with Client 2 at a lower rate than Client 2 was willing to pay AlixPartners.[138]

The focus of the court's factual findings thus narrows to events during that eleven-day period. Plaintiffs did not solicit evidence from Client 2 directly. Mori was the only percipient witness called at trial concerning discussions between Client 2 and Mori during the relevant period. During trial, Mori credibly testified that he did not attempt to influence Client 2's decision, "apart from [by his] mere existence, which is something, . . . [that] cannot be avoided.[139] Mori testified that knew Client 2's CEO from before his time with AlixPartners.[140] After he was terminated from AlixPartners, Client 2's CEO called him and offered him a position.[141]

---

[135] Dkt. 181 ("Pls.' Pre-Trial Br.") at 45; *see* Pls.' Opening Post-Trial Br. at 43–48.

[136] Trial Tr. at 273:3–274:10 (Aversa).

[137] PTO ¶ 61.

[138] *Id.* ¶ 66.

[139] Trial Tr. at 417:22–418:1 (Mori).

[140] JX-146 ("Mori. Dep. Tr.") at 268:18–22.

[141] Trial Tr. at 477:1–478:7 (Mori).

As to that call, Mori testified that Client 2's CEO asked him whether Plaintiffs "would be able to provide the same service that [Defendant] was supposed to provide, had [he] stayed?"[142] Mori did not detail his response to Client 2 at trial. Given events that transpired after the call, the court can reasonably infer that Mori answered Client 2's question in the affirmative.

The focus thus narrows further to the following question: Did Mori "attempt to influence" Client 2 by answering Client 2's unsolicited call and stating that he could do the job? The answer is no.

The word "influence" can be defined broadly, for sure.[143] When coupled with the verb "attempt," one must concede that the phrase has the potential to capture a wide range of activity.[144] Construed in the context of a non-solicitation clause, however, the phrase

[142] *Id.* at 480:8–13 (Mori) (quoting Mori Dep. Tr. at 268:6–13).

[143] *See Influence*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com /dictionary/influence (last visited Feb. 25, 2022) (defining "influence" as "the power or capacity of causing an effect in indirect or intangible ways"); *Influence*, *Black's Law Dictionary* (11th ed. 2019) (defining "influence" as "[u]se of pressure, authority, or power, usu[ally] indirectly, to induce action or change the decisions or acts of another; one or more inducements intended to alter, sway, or affect the will of another, but falling short of coercion"); *Influence*, Lexico, https://www.lexico.com/en/definition/influence (last visited Feb. 25, 2022) (defining "influence" as "[t]he capacity to have an effect on the character, development, or behavior of someone or something, or the effect itself"); *Influence*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/influence (last visited Feb. 25, 2022) (defining "influence" as "the power to have an effect on people or things, or a person or thing that is able to do this").

[144] *See Attempt*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/ dictionary/attempt (last visited Feb. 25, 2022) (defining "attempt" as "to make an effort to do, accomplish, solve or effect"); *Attempt*, *Black's Law Dictionary* (11th ed. 2019) (defining "attempt" as "[t]he act or an instance of making an effort to accomplish something, esp[ecially] without success"); *Attempt*, Lexico, https://www.lexico.com/en/ definition/attempt (last visited Feb. 25, 2022) (defining "attempt" as to "[m]ake an effort

"attempt to influence" must require, at a minimum, some affirmative act directed toward a client. [145] A non-solicitation provision should not be construed to prohibit a former employee from responding to unsolicited inquiries. Otherwise, a former employee would have to be on guard at every turn and possibly barred from responding to a host of acceptable communications.

In this case, the record reflects that Client 2 liked working with Mori and hired him because it wanted to continue that working relationship. Mori's actions toward Client 2—fielding an unsolicited call, answering an unsolicited question, and accepting an unsolicited offer—were not the sort of affirmative acts captured by the Non-Solicitation Provision.

---

to achieve or complete (something, typically a difficult task or action)"); *Attempt*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/attempt (last visited Feb. 25, 2022) (defining "attempt" as "to try to do something, especially something difficult").

[145] *See, e.g.*, *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at *20 (Del. Ch. June 20, 2019) (enforcing non-solicitation clause where defendant solicited almost 150 of plaintiff's customers); *Cabela's LLC v. Wellman*, 2018 WL 5309954, at *12 (Del. Ch. Oct. 26, 2018) (enforcing non-solicitation provision where defendants contacted "at least thirteen vendors with whom [plaintiff] has done business"); *Newell Rubbermaid Inc. v. Storm*, 2014 WL 1266827, at *4 (Del. Ch. Mar. 27, 2014) (enforcing non-solicitation clause where employer alleged defendant solicited two coworkers to leave employer); *Hough Assocs., Inc. v. Hill*, 2007 WL 148751, at *1–2 (Del. Ch. Jan. 17, 2007) (enforcing non-solicitation clause where employee left to work for competitor and helped his new employer solicit his former employer's employees); *RHIS, Inc. v. Boyce*, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001) (enforcing a non-solicitation clause where defendant operated a competing business with plaintiff and solicited plaintiff's referral sources); *Horizon Res., Inc. v. Troy*, 1995 WL 761214, at *1 (Del. Ch. Dec. 21, 1995) (enforcing non-solicitation clause where former employer sought to "lure away" employees); *Gas Oil Prods., Inc. of Del. v. Kabino*, 1987 WL 18432, at *1 (Del. Ch. Oct. 13, 1987) (enforcing non-solicitation clause where defendants solicited plaintiff's customers).

Plaintiffs' single case citation does not compel a contrary conclusion. Plaintiffs cite to *Horizons Resources, Inc. v. Troy*, where this court granted a temporary restraining order in part because of the plaintiff's allegations that former management employees were attempting to "lure away its employees."[146]

*Troy* is procedurally distinguishable from this case. The standard for issuing a temporary restraining order, a preventative form of injunctive relief designed to maintain the status quo, is different from the standard under which a court determines claims post-trial.[147]

More importantly, *Troy* is factually distinguishable from this case. In *Troy*, the defendants were alleged to have created a competing company that attempted to "solicit[] business from" their former employer's clients and "lure away its employees."[148] The alleged solicitation strategy included "situating the new business next to plaintiff, making use of plaintiff's telephone number as that number is listed in the telephone directory, and giving out misleading or blatantly incorrect information to plaintiff's clients and the workers it sends out to those clients."[149] Nothing of the sort happened here.

Instead, the record shows that Client 2 had a good relationship with Mori and wanted to work with him. After AlixPartners told Client 2 that Mori was not going to be managing

---

[146] 1995 WL 761214, at *1; *see* Pls.' Opening Post-Trial Br. at 44–45.

[147] *Compare Arkema Inc. v. Dow Chem. Co.*, 2010 WL 2334386, at *3 (Del. Ch. May 25, 2010) (stating TRO standard), *with Triton Constr. Co.*, 2009 WL 1387115, at *25 (stating post-trial standard).

[148] *Troy*, 1995 WL 761214, at *1.

[149] *Id.* at *4.

the consulting team and offered a different, but comparable, managing director to lead the team, Client 2 refused.[150] Then, after Mori was terminated, Client 2 reached out to him and offered him a job.[151] These circumstances do not amount to the sort of active client solicitation or willful interference with AlixPartners' business relationships that characterized the *Troy* decision. Rather, Mori appears to have cultivated a good working relationship with his employer's client that inured to his benefit upon his termination. His passivity does not merit a finding of breach.

Accordingly, the court finds that Mori did not breach the Award Agreements' Non-Solicitation Provisions.

## C. Misappropriation Of Trade Secrets

In Count III, Plaintiffs claim that Mori misappropriated Plaintiffs' documents containing trade secrets in violation of both the Delaware Uniform Trade Secrets Act ("DUTSA") and Italian law.[152] Mori contends that Delaware law does not apply extraterritorially to his actions in Italy and that his actions were inoffensive in any event.

### 1. Italian Law Applies To The Trade Secret Claim.

As a threshold matter, the parties dispute whether DUTSA or Italian law applies to Plaintiff's claim for trade secret misappropriation. Plaintiffs argue that the court should apply DUTSA to their claim because two of them are Delaware entities and Mori was an

---

[150] PTO ¶ 61.

[151] Trial Tr. at 477:1–478:7 (Mori).

[152] *See* 6 *Del. C.* §§ 2001–09 (DUTSA).

equity partner in Alix Holdings, a Delaware limited liability partnership.[153] Defendant argues in response that DUTSA does not apply to conduct taking place outside of Delaware.[154]

Delaware courts presume that "a law is not intended to apply outside the territorial jurisdiction of the State in which it is enacted."[155] As Vice Chancellor Laster held in *Focus Financial Partners, LLC v. Holsopple*, "DUTSA . . . lacks extraterritorial effect."[156]

In *Focus Financial*, a Delaware entity sued its former employee and his new employer, a competitor, alleging that the defendants had misappropriated trade secrets under DUTSA. The former employer and the competitor were incorporated under Delaware law, but the employee had worked for the former employer primarily in California, and the former employer's principal place of business was in New York. Accordingly, the alleged acts of misappropriation took place outside of Delaware. The court found that the fact of organization under Delaware law was insufficient to justify applying DUTSA to conduct occurring entirely outside of Delaware. Thus, the court held

---

[153] Pls.' Opening Post-Trial Br. at 31–32.

[154] Def.'s Answering Post-Trial Br. at 88–89.

[155] *Singer v. Magnavox Co.*, 380 A.2d 969, 981 (Del. 1977), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *see Ward v. CareFusion Sols., LLC*, 2018 WL 1320225, at *2–3 (Del. Super. Mar. 13, 2018) (interpreting California Labor Code as only applying within California); *Marshall v. Priceline.com Inc.*, 2006 WL 3175318, at *2 (Del. Super. Oct. 31, 2006) (holding that Delaware Consumer Fraud Act does not have extraterritorial effect); *Carter v. Dep't of Pub. Safety*, 290 A.2d 652, 655 (Del. Super. 1972) (declining to interpret Delaware statute requiring the forwarding of convictions to the Delaware Division of Motor Vehicles as having extraterritorial effect).

[156] 250 A.3d 939, 970 (Del. Ch. 2020).

that, while there remained a question as to whether New York's trade secret law or California's would apply to the case, "[o]ne thing is clear: Delaware law does not apply."[157]

So too here. Plaintiffs allege that Mori, an Italian citizen living and working in Italy, misappropriated AlixPartners' trade secrets by copying documents in Italy. The fact that two of the Plaintiffs are Delaware entities and Mori was a partner in a Delaware limited liability partnership does not overcome the presumption against DUTSA's extraterritoriality. Thus, Italian trade secret law applies to Plaintiffs' trade secret claim.

### 2. Plaintiffs Have Failed To Persuade The Court That Certain Documents Constitute Trade Secrets Under Italian Law.

Before attempting to apply Italian law to Plaintiffs' trade secrets claim, the court pauses to make a few observations. This court issues its decisions in English and sits in the United States of America, where the commonly spoken language is English. The court does not have access to primary sources of Italian law, and those that are discoverable through internet searches are generally in Italian. The court's current employees are not required to and do not speak, read, or understand Italian. Thus, the court lacks the ability to independently test the parties' Italian law contentions by conducting its own research. For information concerning Italian law, the court is entirely reliant on the parties, one of whom appeared *pro se*.

To support their positions, each side called experts on Italian law at trial. Plaintiffs called Giovanni Gaudio and Mori called Luca Failla. In addition to their trial testimony,

---

[157] *Id.* at 971.

the court had the benefit of their expert reports,[158] and English translations of the 60 Italian legal sources on which the experts relied, no more than eight of which were relevant to the trade secret claim.[159] That is all.

The materials on Italian law submitted by the parties represent little more than those provided on the closed-universe essay portion of the bar exam. They may be less helpful than that; something is inevitably lost when translating legal principles between languages, as words and phrases in one language may carry connotative impact that is not shared by their foreign-language counterparts, though ostensibly they share a definition. Thus, to the extent that a term's meaning is unclear, the court cannot turn to Black's Law Dictionary or Merriam-Webster to aid its task.

The court cannot overstate the challenges of the task at hand, including the danger of violating some unknown but controlling principle of foreign law. Therefore, the precedential value of this decision on Italian trade secret law should be understood to be limited to the facts of this case and the law as presented by the parties.

That said, the court turns to Italian law on trade secrets. Trade secrets in Italy are protected under Articles 98 and 99 of the Italian Industrial Property Code. Article 98 defines trade secrets as "company information and technical-industrial experiences,

---

[158] *See* JX-122 (Gaudio Expert Report); JX-136 (Failla Rebuttal Expert Report); JX-150 (Gaudio Suppl. Expert Report); JX-153 (Failla Suppl. Rebuttal Expert Report).

[159] *See* JX-175; JX-178.

including commercial experience, subject to the holder's legitimate control, where said information" meets three criteria.[160]

Those three criteria are that the information:

a) is secret, in the sense that it is not, as a whole or in the precise configuration and combination of their elements, generally known or easily accessible to other experts and operators in the field;

b) has economic value as a secret;

c) is subjected, by the persons who enjoy legitimate control thereof, to measures considered reasonably adequate to maintain its secrecy.[161]

Plaintiffs argue that, when Mori copied documents from his work computer, he took protected trade secrets within six broad categories of documents (the "Broad Categories"). In addition, they argue that he used their trade secrets when he accessed a list of email addresses (the "Contact List") and six PowerPoint presentations (the "Presentation Documents"). Following the parties' lead, this analysis focuses first on the two categories of documents that Mori used before turning back to the Broad Categories.

### a. The Contact List

Mori created the Contact List by copying 57 email addresses, mostly for contacts at AlixPartners' clients, from his Work Computer into a blank document.[162] Mori testified that he sorted these email addresses into different categories based on the nature of his

---

[160] Decreto legislativo 10 febbraio 2005, n.30, in G.U. Mar. 4, 2005, n.52, art. 98.

[161] *Id.*

[162] Trial Tr. at 452:1–7 (Mori); JX-159 (Contact List).

42

relationship with each contact and sent group emails to each category with a variation of the message that he was no longer employed with AlixPartners and he was "undertaking new adventures."[163]

Rinaldini testified that AlixPartners does not make its client list or key contacts publicly available.[164] It stores that information along with "the pitches . . . all the leads [AlixPartners] ha[s] with all the clients, all the names and the positions of [AlixPartners] clients and the people [they] work with and the prospective clients," in a secured system called Radius.[165] AlixPartners considers this information, including "lists of client names and contact information," to be a valuable asset that it does not want its competitors to know.[166]

Rinaldini further testified, however, that the email addresses on the Contact List are publicly available through an internet search, provided that one knows a given contact's name and employer.[167] Even so, he contended that the information is still confidential to AlixPartners because it "protect[s] the confidentiality of the clients and of the people [it] work[s] with at the clients."[168]

---

[163] Trial Tr. at 452:8–453:19 (Mori).

[164] *Id.* at 31:20–32:3 (Rinaldini).

[165] *Id.* at 33:7–18 (Rinaldini).

[166] *Id.* at 33:19–34:3 (Rinaldini).

[167] *Id.* at 34:17–35:5 (Rinaldini).

[168] *Id.* at 35:6–15 (Rinaldini).

Client information lists may be protectable under Italian law. For this proposition, Gaudio cited to Tribunal of Turin 15 November 2018, no. 5246.[169] In that case, the plaintiff company engaged in the business of inspecting, certifying, and periodically checking elevators, electrical systems, and work equipment.[170] A group of the plaintiff's employees and shareholders started a competing company and used their access credentials to copy the plaintiff's client databases, which included:

> personal data . . . contact details (telephone numbers and email addresses) . . . the types and characteristics of the subject of the checks, up to all essential elements relating to contracts entered into by the same, including, in particular, the duration (and therefore the dates of the checks) prices and any particular conditions or situations detected during checking . . .[171]

The court held that these databases constituted protectable trade secrets under Article 98 because they contained information related to:

> the operating procedures for the execution of the services and their development; to customers (in particular, personal details and contact details); the nature of the contracts in place with them and their conditions, including the effective date and expiry date and the renewal methods, as well as the financial conditions contracted and applied from time to time; the precise location and technical characteristics of the customer's systems; [and] the deadlines for the periodic checks of each individual system and their outcomes, including any problems encountered[.][172]

---

[169] *See* JX-122 at 14.

[170] *See id.* at 14–15.

[171] JX-175 at 232.

[172] *Id.*

44

The court found that these databases represented "the company's main commercial asset," and that their value "must be considered, not so much in the sense that the data has a market value, but in the sense that their use entails 'a competitive advantage that allows the market share to be maintained or increased.'"[173]

By contrast, the court noted that the Italian Supreme Court has created a different test when considering whether an easily accessible "customer list consisting of a simple list of names and contact details" without other information that would provide a competitive advantage would constitute a trade secret.[174] When evaluating such a list, the Italian Supreme Court has held that it is necessary to:

> consider whether the set of names is characterized by one or more common elements such as to make those customers fall into a specific category, with well-defined commercial characteristics; such that the list would have represented for the company an essential tool in the organization and running of its business and as such an advantage.[175]

Under the above test, as articulated by the Italian Supreme Court, the court does not find that the Contact List constitutes a trade secret under Italian law.

The Contact List is a list of 57 email addresses, most but not all of which are for contacts at AlixPartners' clients. The list does not include the contacts' names, roles, addresses, or phone numbers, nor the names of the contacts' respective organizations, though some of this information may be discernible from the email addresses

---

[173] *Id.* at 233 (citation omitted).

[174] *Id.* (citation omitted).

[175] *Id.* (citation omitted).

themselves.[176] The Contact List does not include information about the relationship between AlixPartners and the clients, such as the length of the relationship, the services provided, or the fees paid. It is a list of email addresses, nothing more. Furthermore, the email addresses on the Contact List are available from public sources and can be found through an internet search. With minimal time and effort, Mori was capable of reproducing the Contact List through proper means, such as through a combination of memory and internet searching.

The contacts on the list, further, cannot "be characterized by one or more common elements such as to make those customers fall into a specific category," as Mori himself separated the email addresses on the list into different categories to send different emails about leaving AlixPartners. Therefore, on the record before the court, it does not appear that the Contact List constitutes a trade secret under Italian law.

Accordingly, because the court finds that the Contact List is not a trade secret, the trade secret misappropriation claim fails as to the Contact List.

### b. The Presentation Documents

The Presentation Documents consist of six PowerPoint presentations related to projects on which the Defendant worked. The documents in question are JX-20, JX-160, JX-8, JX-19, JX-16, and JX-14.[177] The titles of these documents are:

- Profitability improvement premium platform[178]

---

[176] *See* Contact List.

[177] JX-207; PTO ¶¶ 72–82.

[178] JX-20.

- Accelerated Material Cost Reduction Program – Case Example[179]

- INNOVATE: AlixPartners Presentation[180]

- [Redacted] Cost Reduction Status[181]

- [Redacted] Profitability Improvement Project[182]

- [Redacted] LATAM: Profit Improvement Program[183]

The first step of the trade secrets analysis under Article 98 of the Italian Industrial Property Code is to determine whether the information contained in a given document "is secret, in the sense that it is not, as a whole or in the precise configuration and combination of their elements, generally known or easily accessible to other experts and operators in the field."[184] The second, related inquiry is whether the information "has economic value as a secret," which Italian law appears to couch in terms of relative competitive advantage.[185]

Plaintiffs argue that the Presentation Documents contain trade secrets in the form of "cost reduction methodologies and approaches to transformation programs."[186] Rinaldini testified that the six Presentation Documents "contain confidential information because they are documents that relate to client work and specific results of cost reduction programs

---

[179] JX-160.

[180] JX-8.

[181] JX-19.

[182] JX-16.

[183] JX-14.

[184] D.Lgs. n. 30/2005.

[185] *Id.*

[186] Pls.' Opening Post-Trial Br. at 34.

as well as the approach [AlixPartners] ha[s] in transformation programs."[187]  When asked if "the information in these six documents [would] be useful to competitors" Rinaldini answered: "Yes, I believe so."[188]  He continued that because the documents contain information "on the specific programs and specific projects with clients, with details of results achieved . . . they are valuable information potentially for a competitor."[189]  When asked if a competitor could "avoid the cost of creating that information on their own?" Rinalidini answered: "Yes . . . they would have all the results already there without having to do all the work [AlixPartners] did."[190]

Mori argues that the Presentation Documents do not contain trade secrets because those "methodologies have been proven to be widely known in the industry and client specific data / information, (i.e. market intelligence) lose their relevance and potential 'value' for third parties very quickly."[191]

Mori asked Rinaldini on cross-examination if AlixPartners had a "distinctive" methodology, to which Rinaldini stated its methodology "is distinctive to AlixPartners, especially for the ability [AlixPartners] [has] to get results using [it]."[192]  Next, Mori asked "does [the distinctive element] reside in the methodology itself or somewhere else?"  To

---

[187] Trial Tr. at 37:8–12 (Rinaldini).

[188] *Id.* at 37:19–20 (Rinaldini).

[189] *Id.* at 37:21–38:1 (Rinaldini).

[190] *Id.* at 38:2–8 (Rinaldini).

[191] Def.'s Answering Post-Trial Br. at 114.

[192] Trial Tr. at 74:24–75:7 (Rinaldini).

which Rinaldini responded "both," meaning "the robustness of the methodology, the ability we have to use that methodology, the knowledge we have in terms of tools, in terms of even simple forms you need to use. And, therefore, I think the market recognizes the ability to get superior results for clients."[193]

Mori's argument is that since other consulting firms produce similar work with similar, if not the same, methodology, then the Presentation Documents contain information that is either "generally known . . . to other experts and operators in the field" or would not offer a competitor a significant competitive advantage under the first two factors of Article 98.[194] Mori further contends that the Presentation Documents relate to old projects, and the value of information about such projects diminishes relatively quickly over time.

The court turns now to the Italian cases cited by Gaudio to inform its decision. In Tribunal of Turin 15 November 2018, no. 5246, cited in the preceding subsection, the court found that an elevator maintenance company's client databases containing information on the clients' contacts, contracts, systems, and relevant expiration dates for maintenance certifications, among other things, constituted trade secrets.[195] As noted, this was due to the fact that such databases would offer a competitor the opportunity to increase market share by poaching customers because they contained all of the data necessary to know, for instance, when a customer would be in need of an elevator inspection.

---

[193] *Id.* at 75:8–16 (Rinaldini).

[194] *See* D.Lgs. n. 30/2005.

[195] *See* JX-175 at 228–43.

In Tribunal of Bologna 17 April 2012, no. 1059, the court found that a textile machine manufacturer's technical drawings, which were necessary to build the machines, constituted trade secrets "due to the obvious competitive advantage resulting from [their] immediate availability," despite the fact that such drawings could be reverse-engineered by a competitor.[196]

In Tribunal of Bologna 12 March 2012, no. 741, the court found that a pharmaceutical company's cosmetic formulas constituted protectable trade secrets because, even though the ingredients in those formulas were listed on the packaging, their precise composition remained secret. Further, the court noted that, through knowledge of the formulas, "it was possible to abstractly procure and maintain the clients [of the plaintiff company] without particular efforts or business investments."[197]

In Tribunal of Venice 16 July 2015, no. 4457/2015, the court found that an event organizing company's documentation regarding a fair event, including "the lists of the exhibiting companies featuring the contact details of the relative contact persons, lists of potential customers and visitors to the editions already held, as well as commercial information relating to the rates applied, scouting, outfitting, the services requested and sold, and the estimates sent" constituted protectable trade secrets.[198] This was because these customer lists were obtained and filled in over "several years" of interacting with fair

---

[196] *Id.* at 213.

[197] *Id.* at 189.

[198] *Id.* at 246.

participants and would offer a competing events company "an economically significant economic advantage."[199]

Unfortunately, while these authorities give the court a sense of the sorts of documents that would be considered protected trade secrets under Italian law, it has little information on that which would certainly *not* be considered a trade secret. The question is whether the cost-reduction methodologies and transformation programs discernible from the Presentation Documents offer a comparable competitive advantage to a cosmetic formula, technical drawings of a textile machine, or highly detailed customer lists containing the data necessary to poach clients.

After reviewing the Presentation Documents, the court is satisfied that they alone do not constitute trade secrets under Article 98 of the Industrial Property Code. While AlixPartners' methodologies may be partially discernible from the Presentation Documents, in the abstract, the court is unable to conclude that these six documents alone would offer a competitor an "economically significant competitive advantage" of the magnitude offered by the trade secrets discussed in the Italian cases. For example, it appears unlikely that a competitor could review the Presentation Documents, distill AlixPartners' methodologies, and immediately offer the same quality of consulting service AlixPartners offers to a customer or poach one of AlixPartners' clients.

---

[199] *Id.* at 256.

On the record before it, the court concludes that Plaintiffs have failed to carry their burden of persuasion that the Presentation Documents constitute trade secrets under Italian law.

### c.     The Broad Categories

Finally, Plaintiffs argue that, when Mori copied all of the documents on his work computer, he took protected trade secrets within six broad categories of documents: "(a) AlixPartners presentations; (b) AlixPartners reports, revenue assessments, pricing analyses, and studies; (c) notes from AlixPartners meetings; (d) documents regarding AlixPartners recruiting, retention, candidate screening and assessment, compensation, benefit structure, and performance review process; (e) marketing and branding strategies and efforts; and (f) PSTs filled with thousands of emails and contacts."[200]

Rinaldini provided brief testimony as to the contents of each category of documents and how, in his view, each category would provide a competitor with an advantage.[201] Other than that testimony, a couple of paragraphs of briefing,[202] and conclusory statements in Gaudio's expert reports that the information in those categories "may" constitute trade secrets under Italian law,[203] the court does not have much foundation on which to base a decision.

---

[200] Pls.' Opening Post-Trial Br. at 33–34.

[201] *See* Trial Tr. at 23:4–27:15 (Rinaldini).

[202] Pls.' Opening Post-Trial Br. at 33–34; Pls.' Reply Post-Trial Br. at 11–12.

[203] JX-122 at 16–17; JX-150 at 28.

On this record, the court is not prepared to hold Mori liable for trade secret misappropriation as to the Broad Categories. However, the court does not wish to foreclose the possibility that Plaintiffs are entitled to some recovery for this claim. Therefore, the court will leave it up to Plaintiffs. If Plaintiffs wish to pursue their claim that Mori misappropriated trade secrets as to the Broad Categories, they shall notify the court and meet and confer with Mori on a schedule and manner for presenting the following issues to the court:

- How the documents in the Broad Categories constitute trade secrets under Italian law, with citations to support in the existing record;

- How Italian courts have interpreted the phrase "abusively" or "in an abusive manner" with respect to the acquisition of trade secrets under Article 99 of the Italian Industrial Property Code;[204]

- The extent to which Articles 98 and 99 of the Italian Industrial Property Code are applicable to former employees that are not otherwise competitors, given the separation of Italian courts by subject matter (i.e., for industrial disputes versus labor disputes);[205]

- Whether an Italian court has ever awarded damages based on the amount of expenses incurred by a plaintiff in evaluating the extent of a cybersecurity breach;

- Whether an Italian court has ever held a former employee liable under Articles 98 and 99 of the Italian Industrial Property Code solely for the acquisition, and not the use or disclosure, of an employer's trade secrets.

---

[204] *See* Decreto legislativo 10 febbraio 2005, n.30, in G.U. Mar. 4, 2005, n.52, art. 99.

[205] *See* JX-175 at 186 (the Tribunal of Bologna 12 March 2012, no. 741 stating that "it must also be noted that the act of theft of confidential information occurring during the period in which the [former employee co-defendant] was employed by [the plaintiff company] constituting cases of contractual violation . . . may not be subject to investigation at this time").

53

Plaintiffs can weigh for themselves whether the additional investment of expense is worth any potential recovery on this aspect of their claim and shall notify the court how they wish to proceed within 30 days from the entry of this decision. For now, judgment is entered in Mori's favor as to the Contact List and Presentation Documents and stayed as to the Broad Categories.

### D.     Conversion

In Count IV, Plaintiffs claim that Mori committed the tort of conversion by copying their confidential and proprietary information and using that information for his own benefit.[206]

"Conversion is 'any distinct act of dominion wrongfully exerted over the property of another, in denial of [the plaintiff's] right, or inconsistent with it.'"[207] "Generally, the necessary elements for a conversion under Delaware law are that a plaintiff had a property interest in the converted goods; that the plaintiff had a right to possession of the goods; and that the plaintiff sustained damages."[208]

---

[206] *See* Pls.' Opening Post-Trial Br. at 37.

[207] *Kuroda v. SPJS Hldgs., L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009) (quoting *Drug, Inc. v. Hunt*, 168 A. 87, 93 (Del. 1933)) (brackets in original).

[208] *Stone & Paper Invs., LLC v. Blanch*, 2020 WL 3496694, at *10 (Del. Ch. June 29, 2020) (quoting *Goodrich v. E.F. Hutton Gp., Inc.*, 542 A.2d 1200, 1203 (Del. Ch. 1988)). Stated differently: "The necessary elements for a conversion under Delaware law are that a plaintiff: (1) had a property interest in the converted goods; (2) had a right to possession of the goods; and, (3) the property was converted." *CLP Toxicology, Inc. v. Casla Bio Hldgs. LLC*, 2021 WL 2588905, at *14 (Del. Ch. June 14, 2021) (citation omitted).

"It is well settled under Delaware law that a plaintiff cannot bring a claim of conversion arising solely out of a breach of contract claim."[209] As Vice Chancellor Glasscock explained in *Kim v. Coupang, LLC*, this court has declined to dismiss conversion claims as duplicative of breach of contract claims where the remedies for either claim would differ or the contract at issue is missing a material term.[210]

Here, the elements of Plaintiffs' claim for conversion largely track their claim for breach of the confidentiality provisions of the Partnership Agreement. Technically, therefore, Plaintiffs would prevail on their claim for conversion for the same reason that they prevailed on their claim for breach. Somewhat ironically, however, this is fatal to their conversion claim. Like the plaintiff in *Coupang*, any remedy awarded to Plaintiffs for their conversion claim would be duplicative of that awarded for breach of the relevant

---

[209] *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *14 (Del. Ch. May 29, 2020) (citation omitted); *see Kuroda*, 971 A.2d at 889 ("[I]n order to assert a tort claim along with a contract claim, the plaintiff must generally allege that the defendant violated an independent legal duty, apart from the duty imposed by contract." (citation omitted)); Pls.' Opening Post-Trial Br. at 38; *see also Smith v. Scott*, 2021 WL 1592463, at *11 (Del. Ch. Apr. 23, 2021).

[210] *See Kim v. Coupang, LLC*, 2021 WL 3671136, at *7 (Del. Ch. Aug. 19, 2021) ("In *Smith v. Scott*, [2021 WL 1592463, at *11] this court declined to dismiss a conversion claim as duplicative of a breach of contract claim because there was a sufficient likelihood, as pled, that the 'traditional remedy for a conversion,' namely the value of the property at the time of the conversion, would not be available through plaintiff's breach of contract claim. And, in *Malca v. Rappi, Inc.*, [2021 WL 2044268, at *5 (Del. Ch. May 20, 2021)] the court declined to dismiss a conversion claim as duplicative where the claim did not 'arise solely from a breach of contract' and it was possible the contract at issue would be deemed to lack material terms. None of these circumstances are present here. [The plaintiff] does not argue that specific performance of the Employment Contract would be insufficient to remedy the alleged harm; the conversion claim and the breach of contract claim are virtually indistinguishable; and neither party has argued the Employment Contract lacks material terms or is otherwise unenforceable as written.").

contract, the Partnership Agreement, which neither party contends lacks any essential terms. Plaintiffs' conversion claim fails, and this analysis thus turns to the question of remedies.

### E. Remedies

To recap, this court has found that Plaintiffs have proven that Mori breached the confidentiality provisions of the Partnership Agreement. As redress for Plaintiffs' claim under the Partnership Agreement, Plaintiffs seek injunctive relief and nominal damages.

#### 1. Injunctive Relief

Plaintiffs argue that harm is imminent because Mori's "continued use and inevitable disclosure will subject AlixPartners to unfair competition whereby its competitors are able to benefit from its intellectual property without making the same corresponding investment."[211] To avoid this ostensibly inevitable disclosure, Plaintiffs seek relief in the form of a permanent injunction and a forensic protocol by which they can review forensic images of all of Defendant's personal devices.[212]

"To demonstrate entitlement to a permanent injunction, a plaintiff must satisfy three elements; a plaintiff must show (1) actual success on the merits of the claims; (2) that irreparable harm will be suffered if injunctive relief is not granted; and (3) that the equities support the relief requested."[213]

---

[211] Pls.' Pre-Trial Br. at 49.

[212] *See* Pls.' Opening Post-Trial Br. at 48–50; Pls.' Reply Post-Trial Br. at 27–29.

[213] *N. River Ins. Co. v. Mine Safety Appliances Co.*, 2013 WL 6713229, at \*7 (Del. Ch. Dec. 20, 2013) (citation omitted). It is well-established that "[e]quity will not do a useless thing." *Id.* at \*9 (quoting *Walker v. Lamb*, 259 A.2d 663, 663 (Del. 1969)) (brackets in

Plaintiffs have not met their burden of demonstrating that they will suffer irreparable harm absent injunctive relief. Mori has testified that he is no longer in possession of the vast majority of the AlixPartners' confidential documents he copied.[214] Indeed, he was compelled to return and destroy AlixPartners confidential information under the Second Status Quo Order and has demonstrated that he complied with these terms.[215] Mori has also testified that he does not intend to keep any of this information after this litigation has concluded.[216] Given these facts, Plaintiffs' claim that Mori will inevitably disclose their confidential documents falls short. Plaintiffs are not entitled to a permanent injunction against Mori.

---

original). Thus, "an injunction will 'not be granted where it would be ineffective to achieve its desired result,'" as is the case here. *Id.* at *7 (quoting *New Castle County v. Peterson*, 1987 WL 13099, at *3 (Del. Ch. June 30, 1987)).

[214] Trial Tr. at 415:7–17 (Mori) ("I have no interest in keeping the forensic copies of the documents by AlixPartners that are still in my attorney's possessions or still available to them. Nor do I intend to keep or want to keep the dozens of documents that are confidential by AlixPartners that were sent to me by the plaintiff through the preparation of this trial. And I have expressed many times my will to destroy such documents. And I hope that this Court will consider this request or this desire I expressed in the appropriate way.").

[215] Second SQO ¶ 11 ("The parties shall further meet and confer and seek to mutually agree upon whether any documents within the Search Term Documents constitute AP Documents that should be deleted from Defendant's personal computer and/or external hard drive."); Trial Tr. at 412:19–413:1 (Mori) ("After this agreement, I identified all the documents that I needed for my Italian claim, and I also identified and proceeded to erase all the other documents, which were classified as AlixPartners' documents, in line with what laid down in the SQO. So at the moment, I have no more access to any AlixPartners documents.").

[216] Trial Tr. at 415:7–17 (Mori).

### 2. Damages

Plaintiffs seek only nominal damages in the amount of $7 for the one claim they prevailed on—breach of the confidentiality provision of the Partnership Agreement.[217] Plaintiffs are entitled to nominal damages in the amount of $7.

## III. CONCLUSION

For the foregoing reasons, judgment is entered in AlixPartners' favor as to Mori's breach of the Partnership Agreement, and in Mori's favor as to all other issues in this action that have not been stayed. The parties shall confer on a form of order implementing this decision.[218]

---

[217] Pls.' Opening Post-Trial Br. at 57 ("AlixPartners seeks nominal damages (e.g., $7) for Defendant's breach of the Partnership Agreement."); *see also USH Ventures v. Glob. Telesystems Gp., Inc.*, 796 A.2d 7, 23 (Del. Super. 2000).

[218] Post-trial, Mori raised the defense of unclean hands, but does not identify as to which claim or claims he asserts this defense or how it applies. Given the belated nature of the defense and paucity of briefing on this issue, Mori has waived any unclean hands defense. Also post-trial, Mori requested relief that he has either failed to prove or that is unavailable in this court. Mori's requests for relief are denied.